Your Honor, may it please the Court, I'm John Vecchione, and I'm representing Mr. Luttrell here. I did not represent him below. My friend John Bynes did. He asked me to argue this. One of the other roles I have is I've been a member of the Plaintiff's Steering Committee of the MDL, from which this case emerged since the inception of that Plaintiff's Steering Committee. And I will address some of my remarks to that when we get to the law of the case. The standard of review is the first thing the Court looks at. The standard of review, we argue in this case, is de novo, both for summary judgment and for whether or not the right standard of Daubert was applied. If the right standard of Daubert was applied, you then go to an abuse of discretion standard. And we think this case, under either prong, has got to be reversed because Dr. Jackson did all that he was required to do under Daubert to have his testimony reach a jury. And the reason for that is, I will tell you who Dr. Jackson is. The very first case in the MDL, there was a wave of 10. There was a White case. In his report, he says, I was in White. Well, he wasn't retained in White. He was a treating physician. He had been referred Mr. White. It was a case that Novartis picked in the MDL. I met him, and he first was proposed as a treating physician. He gave a one-page report at my request, put that in, went to the MDL. We had a retained expert in the MDL, and that case is in our briefs, but it's in re-eredit, iridia zometa, products liability litigation, White, 2009, Westlaw, 249-7692, Middle Tennessee, August 13, 2009. The judge did not reach Daubert with Dr. Jackson because he said, Dr. Najjar used the AOMS guidelines, and he passed. I'm not going to reach all the treaters right now. But he said he can testify as to his diagnosis and what he would have done differently, as he did, as the MDL judge did for everyone. So, come to this case, Dr. Jackson was a retained expert, and he did the same sort of thing. So, what did Dr. Jackson do? He examined the medical records. He examined the statements of all the treaters. And under the Daubert factors, they're all laid out, but there's an additional one here. Daubert was created to make sure that wild theories didn't get into the courtroom. But there are no cases cited by Novartis or by us that we've ever seen whereby every treating physician says that it's bronze, it's the disease that the plaintiff claims was caused by the defendant's drug. In all those cases, there's clashing testimony in almost all of them. In this one, the pathology reports, the oncologist, the oral maxillofacial surgeons, the dentists, all these folks with wide bodies of medical experience say bronze, and they say nothing else. Some of them are willing to say they weren't really opining on causation. They had a working diagnosis. That's true, Your Honor, but the important point, even more important than them saying it's bronze, is that in their areas, the oncologist's area, there are other things. There's chemotherapy. He's aware of chemotherapy. He's aware of cancer. He did not ascribe it to that, and he's certainly an expert in that area. Certainly with the oral maxillofacial surgeon, again, he didn't ascribe it to any of these other things. I think under the Daubert standard, when you have so much, so many medical records, that you have to say, well, wait a minute, why should this not be okay in a courtroom when it's okay for treating and diagnosing a person over a course of many years, and there's no disputes? Would it matter? Is there testimony that it would have mattered to the treating physicians why a patient had this type of necrosis, treating it as being caused by this drug, as opposed to having it being caused by anything else? Yes, Your Honor, there is, and it's both in the AOMS guidelines, which I'm going to be quoting from ER 71 and ER 72, and also Dr. Jackson has testified to this, and as has Dr. Marks, who is the general. What you do is you don't want to do the invasive surgery. If it's osteomyelitis, a regular osteomyelitis, first of all, very, very rarely will it ever have exposed bone over eight weeks. When I get to the AOMS definition, that's important. But what you do there is you debride, you give high doses of antibiotics, and you expect it to clear up. Here, because what Iridia and Zometa do is they affect what's called the osteoclast, and if you read Dr. Jackson's depositions, he talks about how the osteoclast changes the bone. In our bodies, the osteoblast puts new bone in, and the osteoclast takes old bone out. What happens here is the osteoclasts are turned off by Iridia and Zometa, and for good reasons. It's the therapeutic method. But they would have treated it differently. Correct. I don't want to use up all your time. They would have treated it differently if it had been Bronte. Yes. Okay. Yes, Your Honor. I'm just going to finish up with what Dr. Jackson did and said. Counsel, you're going to run out of time. I would like to have you address, let's assume that Dr. Jackson's testimony should have been admitted. Yes, Your Honor. It is my understanding that after the facts became known, in fact, after the suit was filed, his treating physician nonetheless went ahead and continued to give Mr. Luttrell the treatment. Let me finish my question. So as foundation for why I'm asking the question, it's my understanding that under Washington law in a failure-to-warn case, they have the concept of the learned intermediary. So it's not so much, as I understand it, that Mr. Luttrell need to know the problem or the risks, but it's the treating doctor in this case, the treating dentist or whatever. So to the extent that once the risks were fully known at that point, he continued with the treatment, if I'm correct, how does that play into essentially a harmless error or absence of causation analysis? Well, if we go to the AOMS guidelines, here's where Dr. Brady is not a learned intermediary and where there is a genuine issue of material fact. Now, Mr. Luttrell took two more doses, I believe it was two more doses at Dr. Brady's suggestion, but then took himself off even after his recommendation. But here's the key thing. Dr. Brady, who is an expert for Novartis, has said that he did not believe you could make the ONJ worse. He said, I'm just going to keep prescribing because he has ONJ, you can't make it worse. Well, this is a giant fight amongst the parties. I've been doing this for some time, and if you read the AOMS guidelines at page ER78, ER78 says that it's the oncologist's decision whether to keep prescribing. However, if systemic conditions permit, long-term discontinuation might be beneficial in stabilizing established sites of BRONJ, reducing the risk of new site development, and reducing clinical symptoms. But isn't that just why you think he ought not have prescribed it? He didn't know that. If you read his testimony, he says there's no harm to keep doing it, all right? He was not a learned intermediary there. They didn't warn him of that. They did warn him. And that's your theory? There's no warning, and he doesn't know it, about the increased risk and severity from cumulative dose. The evidence here that we've gathered in the MDL, that was before the MDL court, and it's before this court through citations, but it was not fully in the briefs because, as I will get to in one moment, we believe that's law of the case. Here, Dr. Jackson says specifically that his experience is that you stop the drug to improve the healing. So in either case, there's an exacerbation argument here, and summary judgment was still inappropriate. Because Dr. Jackson says specifically that more makes it worse, and stopping bisphosphonate helps healing. That's at ER 512 to 513. Now, Dr. Brady says, I didn't know any of that. And if you look at all of his testimony, Dr. Brady's on the bubble, whether to be giving Mr. Luttrell the drug. Now, I want to turn, Your Honors, I do think- Counsel, before you turn on that, let me just try to clarify this. Because I had a question similar to Judge Fisher's, but in simpler terms, it was just, you know, why doesn't proximate cause scuttle the case of Luttrell if his doctor told him to use the medicine after the suit was filed? What I hear you saying is, well, the doctor really didn't understand that. Because he was not warned. He was not warned about the cumulativeness or that there's nothing in here that the cumulative dose makes things more severe, which is the evidence and what the medicine shows. Dr. Brady- Did your complaint, was that not sufficient to put him on notice of that? The doctor? No. The doctor, we don't send the doctor's complaints, and we leave the doctors alone. As an attorney, I've never sued a doctor in these cases, and nor am I going to, but I can say they're not learned intermediaries, as he wasn't here. You read Dr. Brady's testimony, he doesn't know this. And he doesn't know this fact. We argue, there's much evidence in the record and across all these cases, that Novartis is the one pushing continued dosing after you get ONJ. That's their mantra. And that's why it's a failure to warn. Because really, it's not only a failure to warn, it's telling doctors something that's not true. Now, I reserve four minutes. I do want to address one point, because I've addressed the main point of the two extra doses he got afterwards. But I want to say one thing about the warnings issue. Washington State law does not differ. It is statutory law, but it doesn't differ on warnings from any of the many cases that the MDL judge determined. And then he sent, with each remand, he sent that whether or not the warnings were adequate, there is a genuine issue and dispute here in these cases. For someone like Mr. Bynes, who wasn't on the plaintiff's steering committee, we have hundreds of these cases being remanded. The plaintiffs have got to be able to rely that if the judge is going to readdress whether warnings are adequate or not, and particularly here, where under Florida and New Jersey law, there's a presumption that there isn't under Washington State law. There's a presumption that if you get over the FDA, that the warnings are adequate. Our evidence, which is in the Second Germany Declaration, which is through Marx, through Parisian, through all of our case-wide experts, was massive. It came up all, it's massive. And if each judge is going to redo that decision on this, on whether the letter was adequate, that was before the MDL judge, all this was before the MDL judge, we wasted years there if before a judge overturns that ruling, he has to say why and has to ask the plaintiff to please put in the same things that the MDL judge had. So we believe that was law of the case. It was remanded with those orders from the MDL judge. So that really goes to, it just seems to me this is a little bit apples and oranges, because one has to do with adequacy of the warning. Correct. And when the case was remanded, there was a pending, ripe, unruled-upon motion for summary judgment. There were two, actually, right? And the go-to causation and doubt-bearer. Yes. And so the proximate cause about the extra doses, the two doses after the complaint was filed, that's a different issue. Adequacy of the warning should not have been revisited here without some warning to the MDL judge. Where did the court revisit that? He stated that we haven't distinguished why under Washington law the warnings aren't adequate. But what we said was, here's all this information. And Washington law is the same. It's less burdensome than Florida and New Jersey and all these other places. Go look at Marx and Parisian and everyone. I'll reserve the rest of my time, Ron. Thank you. Okay. For Novartis, is this Mr. Leone? Yes. Thank you, Your Honor. May it please the Court. Frank Leone for Novartis Pharmaceuticals Corporation. And I'm here with Rebecca Wommeldorf. This is a case about a pharmaceutical drug that helped Mr. Luttrell so much that he took it for a year. He developed a jaw problem, which he claims the drug caused. He filed a lawsuit, and he went right back on it. And the reason was that the drug provided the benefits to him, and his doctor was fully aware of the risks as well as the benefits of the drug. The drug is used because Mr. Luttrell had multiple myeloma, which is a cancer that attacks various parts of the body, including the bone. And it can cause bone pain. It can cause bone fractures. It can cause spinal compression and paralysis. And Dr. Brady testified that he prescribed this drug to Mr. Luttrell to prevent and reduce the possibility of these bone problems, as well as prolong the remission of Mr. Luttrell's multiple myeloma. And the record shows, in fact, that the lawsuit was filed in March 2007. In May 2007, Dr. Brady, the oncologist, discussed the situation when Mr. Luttrell started prescribing Aredia or generic Pimidronate, we would argue, and prescribed it for an additional 11 doses from 2007 through 2009. So during all of this period of time, Dr. Brady was aware of the potential risk. And, in fact, the record showed that Dr. Brady testified that he was aware of the potential risk of ONJ prior to ever prescribing the drug in 2004, that he prescribed it, that he re-prescribed it after the ONJ developed, and that he still prescribes bisphosphonates to patients today. So the issue that the court properly looked at was, if Novartis had provided different warnings, would that have changed Dr. Brady's prescription decision? And the court found, after conducting a comprehensive review of Dr. Brady's testimony, that there is compelling evidence that Dr. Brady and Luttrell would have taken the same course of action, even if the warnings about BRONJ were increased or different. So, Mr. Leon, what is the doctrine that comes under, is that proximate cause? Yes, it's proximate cause, and it's proximate cause that relates to the warning. On the law of the case issue that Plaintiff's raised, that relates to adequacy of the warning. That's a different question. The court in Luttrell looked at the question of adequacy and found that it was a disputed issue in its opinion. But assuming the warning was inadequate, the court found there was no evidence, and it's up to plaintiffs in response to a summary judgment motion to come up with actual evidence, material facts that would show that the doctor would have done something differently if the warning had been different that would have avoided the plaintiff's injury. And the court properly found there was absolutely no evidence in the record to support that contention. Okay. Now, just you said that, contrary to what counsel for Mr. Luttrell said, that Dr. Brady was fully informed that he knew if there's an exacerbation or a downside to continuing the treatment, that he was ignorant of that enough such that he doesn't constitute a learned intermediary. So he talked about two doses. You talked about 11 doses. So the facts that support the differentiation between those two accounts are not materially in dispute? There are no facts that support plaintiff's contention that the doctor would have done something differently if Novartis had told him anything different. There is simply speculation. Well, okay. This learned intermediary, I've not run into that before, so I'm trying to understand the implications of it. Because if my doctor prescribes something to my oncologist, prescribes something to me, and I'm an active patient and want to know what and why, if the doctor isn't giving me a full report about why he's prescribing this risky drug because he doesn't know all the risks involved, he may have started out with an understanding. But if there's more to the risk calculus than the doctor, Dr. Brady, would be aware of, so that his choices, he may have decided to go on with the treatment, like tamoxifen. I mean, there were issues on breast cancer, whether women would take the risk or not. So that's what I'm troubled by, that there's no material dispute of fact that Brady had all the information necessary to give a full-on statement of the risks of a continuation of the dosage. Well, under the Cherhoon case, under Washington State law, the doctor isn't required to warn the patient at all. The only warning needs to go from the company to the doctor, and then he can decide in his discretion what warnings he wants to pass on. But it's plaintiff's burden to show that if Dr. Brady had been told something different about continuing treatment, that he would have done something different. And that's where there's no dispute of material fact, because plaintiffs don't have any evidence of that. The only thing that plaintiffs point to, and it's cited in the court's opinion at page 43, is a comment at Dr. Brady's deposition where he said he didn't know if, he didn't think that prescribing Aredia intermittently would make the job worse. But he immediately testified that one has to weigh the risks against the benefits and make a decision about what the best thing was to do at the time. With Luttrell, I became concerned and remain concerned he's achieved substantial gain in terms of quality and durability of his remission, that is his remission from cancer, from the bisphosphonates. And that's why I was asking my question because of Cherhoon. If the doctor would have communicated risks, whether he decides to or not, then counsel said he doesn't sue the doctors. But Mr. Luttrell himself might decide to sue the doctor if the doctor knew more than he conveyed in doing the risk. That case is not before us. But it does seem to me that the learned intermediary rule puts a burden on the manufacturer, if it's going to get off on a failure to warrant, to make sure that it has exposed the doctor to the full range of risk. And if Brady didn't know it, that's one thing, and didn't pass it. But if he had been exposed to it and chose to discount it because of his own professional judgment, that's another thing. So you're saying it's clearly in the he had enough information and Mr. Luttrell wasn't disadvantaged by his doctor being disadvantaged. Yes, Your Honor. The plaintiffs don't have evidence that the doctor would have done anything different if he had been told anything differently about the drug. That's what the record shows. I just want to be clear. You're not contending that Brady was told that continued use of these drugs, if a person has Bronje, could make it worse? That's not your contention? That information is not on the label, but to the extent it is available to the public and available to the medical community, I don't know that he didn't know that. Well, didn't he testify he didn't know that? No, he testified that he wasn't sure if it would make it worse. He considered the risks and benefits. The doctor took Mr. Luttrell off the drug when Mr. Luttrell first developed the ONJ because at that time, according to the testimony that's cited in the opinion, the doctor was considering whether keeping him on the drug would make it worse. The point is it's not clear whether or not it would make it worse or not. The doctor was aware of the risks of ONJ. He was aware that the patient had contracted ONJ, and he felt the benefits of continued use outweighed that risk, and that's what the court properly found. He testified, I think, that use of these medications was the standard of care. He did. And I'm confident that he said that at the outset, but was that his view that use of the medication was the standard of care even after BRONJ had been diagnosed? That is what he determined to do in this case. You're not answering the question. Did he testify that that – I understand that's what he determined to do, but not to interrupt you, but my question is different. Did he testify that that's the standard of care after BRONJ has been diagnosed? I don't know that he had a specific statement one way or another on that. Thank you. So this court, Your Honors, is like a number of other cases where the courts considered these specific factual questions involving the specific prescribing physicians and the specific plaintiffs and concluded, and we've cited a number of them on page 26 of our brief, and concluded that plaintiffs simply lack evidence to defeat summary judgment on this issue and to show that the doctor would have done something different that would have prevented plaintiff's injury. Okay. Now the court – Okay. Now I just want to summarize what I'm taking from this, and I'm doing it because I don't want to take the wrong thing. Okay. So I heard you say that the law of the case may control on whether there was an adequate failure to warn. Is that correct? No, Your Honor. The court considered the adequacy issue on a motion for summary judgment. The question was, are these labels, which evolved over time, adequate, period. And the court denied that motion. Okay, so that's still at issue. Yes, Your Honor, it is. That's your tribal issue of fact. It is, Your Honor. Okay, and you're saying, notwithstanding that, if it were to resolve in the future after trial that the label didn't warn of the full range of risk to the degree that a doctor treating these problems would pass along that information or make an informed decision, that there was not enough information. And nonetheless, there was, in the proximate cause step, that Brady had enough information to know the risks, even including the risk of continuing to use it after Brundt emerged, and that that's not in any way disputable in this case. Yes, that is correct, Your Honor. Even though it's an open question whether Novartis had made enough disclosures to the treating doctors in the first place? Looking at the record, yes, Your Honor, looking at the record, the court found that even if the warning was not adequate, it would not have changed the prescriber's decision. And the evidence was, there was evidence that the doctor knew about the risk. He put the patient on it afterwards again. Now, the court had three different grounds for granting Novartis' summary judgment in this case. The proximate cause of the warning is the first ground. The second ground was that plaintiff failed to state sufficient specific causation testimony through its expert, Dr. Jackson. Specifically, the court found that Dr. Jackson never definitely opines on the record that Luttrell's ONJ was caused by Aurelia or Zometa. And plaintiff suggests and suggested in his briefing that a diagnosis of BRONJ, that is, dysphosphonate-related osteonecrosis of the jaw, is an equivalent finding that the dysphosphonates caused the ONJ, that that's a general causation statement and that it's a specific causation statement, that anyone who meets the criteria for BRONJ, which is having osteonecrosis of the jaw for more than eight weeks and having taken dysphosphonates, therefore the dysphosphonates caused it. Well, that's not the case, and there is not sufficient support in the record to make that the case. That's not what the AAMS is. What would dysphosphonate-related ONJ mean if it didn't mean there was a causal connection between use of dysphosphonates and developing ONJ? It is a diagnosis that the AALMS set out, and the reason why they did that is they wanted to identify people who were in this category and because in the interest of avoiding further harm to plaintiffs who had dysphosphonates in their jaw, it recommended certain treatment decisions. But assumptions for treatment are not the same thing as a finding of causation, as this court found in the Golden v. CH2M Hill case. The AALMS itself says that the evidence is not clear as to whether there is causation in general, and it certainly doesn't say that anybody who took dysphosphonates and has delayed necrosis of the jaw, that dysphosphonates were the cause. Plaintiffs are trying to take a shortcut and use that, and that's not what it says. And, in fact, the only appellate court to look at this issue is the Sixth Circuit in the Simmons case, which we cited, and there it found that a diagnosis of dysphosphonate-related ONJ, treatment records that stated dysphosphonate-induced osteonecrosis, and that a treating physician said that there was just a very close association, like Dr. Jackson said, related, that does not equal causation. And so that court found that just saying someone has bronze is not the same thing as saying dysphosphonates caused the injury. In this case, the court found first that Dr. Jackson didn't state that opinion, and then we get to the third issue, which is the Daubert issue, where the court applied a flexible Daubert standard, and it's subject to review by this court, of course, under a highly deferential abuse of discretion standard, and felt that Dr. Jackson had not stated a reliable opinion that dysphosphonates were the cause of Mr. Littrell's jaw condition. So those are the three different grounds that this court had set out. It looked at the record very carefully. The discussion of various things that went on in the MDL are simply not relevant here. The court looked at the facts of this case and came to a sound conclusion, and in terms of Daubert, and a conclusion that this court should not disturb. Thank you, Your Honor. Thank you. And are you arguing also in the Messick case? Yes, Your Honor, I am. Okay. Well, you can elaborate further on Dr. Jackson's testimony in that one. I'll be happy to do so, Your Honor. Okay. Thank you. For appellant again. Your Honor, very briefly, I disagree with the last comments made. Please look at ER 72 of the AOMS guidelines. There is the cause section. If you read that, you'll see that for standards in court, it's well over what cause is. The AOMS says that there is a 2.7 to 4.2 relative risk for cancer patients on bisphosphonates over cancer patients who don't have bisphosphonates. A relative risk above 2 meets Daubert, and the relative risk in the AOMS document is 2.7 to 4.2. It's well over the Daubert standards. And you should also look on ER 71 when the AOMS lays out what it's doing. It says it's bullet 2 on page ER 71. The purpose is to create a differential diagnosis. The very differential diagnosis, as Washington State law allows, to be causal. And the Simmons case, again, Your Honor, I do a lot of this. Simmons, there was a dentist who was, he wasn't an oral maxillofacial surgeon. I don't even think he belonged to the AOMS. I think that's the case. I did not do that case. And I don't think he did a report either. So Simmons is distinguishable. What was the first site to the ER before 71? ER 72. 72. And there they say. That's fine. Now, I also want to address the, I want the court to look at the Fussman case, the first tried case, because it addresses the learned intermediary question that Judge Fischer just asked, and that is this. What happens when the doctor doesn't know something important? It is laid at the feet under all learned intermediary law. The learned intermediary law for every state is pretty similar, except maybe West Virginia doesn't have it, but by and large it's pretty similar. And if you look at the Fussman case, in that case the doctor didn't know certain things, just like Dr. Brady doesn't. And when he was, he's on the bubble of prescribing here. And there's another aspect of that, and that is he prescribes a meta. If you read the AOMS guidelines, I believe it's ER 71 or 72, Zometa is many, many times more powerful than the Aridia. It causes the ONJ much faster and much more severely. And in this case he does not prescribe Zometa afterwards, which is a difference. He extends the prescriptions he did for Aridia to try and get benefit without doing harm. Now, he didn't know about cumulative dose, but he changed his prescribing habits. Even the defendant will admit. And that creates material fact for the jury. What would he have done if he knew about cumulative dose and the relative risks? The other thing is that Mr. Lowen says he knew the risk. Now, Vardis never says what the risk is. If you look at the AOMS guidelines, they vary between 0.8% and 12%. These are enormous risks in this type of law, when you do this type of law. There's no evidence that Dr. Brady knew how often it causes BRONJ or how much. So, Your Honor, I have addressed what I wanted to address. If there's any questions, I'll do it. But I do believe this has to be reversed, both because Dalbert was more than met. If you read the deposition of Dr. Jackson, he excluded everything. And if you read his report, he uses the term, the etiology, ETI, was radiation. Well, in these new cases, it wasn't radiation, it was bisphosphonates. He said it right there. He was consistent in his deposition. And it is abusive discretion where all over the country and in California and in Washington State, if you do this analysis and you come up with this diagnosis, it gets in under Dalbert except here. That shouldn't be the way. Thank you, Your Honor. Thank you. Very interesting case and remains interesting in the Messick case. I guess that concludes Littrell, and it shall be submitted.
judges: Fisher, Gould, Christen